**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| FRESHUB, INC., a Delaware Corporation, and FRESHUB, LTD., an Israeli Limited Liability Company,<br><br>    Plaintiffs,<br><br> vs.<br><br>AMAZON.COM INC., a Delaware Corporation, AMAZON.COM SERVICES, LLC, a Delaware Limited Liability Company, PRIME NOW, LLC, a Delaware Limited Liability Company, and WHOLE FOODS MARKET SERVICES, INC., a Texas Corporation,<br><br>    Defendants. | Case No.: 6:21-CV-00511-ADA |

**PLAINTIFFS FRESHUB, INC.'S AND FRESHUB, LTD.'S**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**
**PURSUANT TO FED. R. CIV. PROC. 50(B) AND**
**MOTION FOR NEW TRIAL ON INFRINGEMENT AND**
<u>**DAMAGES PURSUANT TO FED. R. CIV. PROC. 59(A)**</u>

Paul J. Andre
Lisa Kobialka
James Hannah
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 752-1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

John Palmer
Texas Bar No. 15430600
NAMAN HOWELL SMITH & LEE PLLC
400 Austin Ave., Suite 800, P.O. Box 1470
Waco, TX 76703
Telephone: (254) 755-4100
Facsimile: (254) 754-6331
palmer@namanhowell.com

*Attorneys for Plaintiffs,*
FRESHUB, INC. and FRESHUB, LTD.

Dated: August 11, 2021

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. FRESHUB IS ENTITLED TO JMOL OF INFRINGEMENT .......................................... 1

    A.  Defendants Failed to Rebut Freshub's Substantial Evidence of Infringement for the '153 Patent ................................................................................ 2

    B.  The Jury Only Had Substantial Evidence of Defendants' Infringement of the '408 Patent ........................................................................................ 7

    C.  The Jury Only Had Substantial Evidence of Defendants' Infringement of the '801 Patent ........................................................................................ 9

    D.  Defendants' Fact Witnesses Admitted that the Three Claim Elements of Defendants' Non-Infringement Defense Are in the Accused Alexa Products ..... 10

III. ALTERNATIVELY, FRESHUB REQUESTS A NEW TRIAL UNDER RULE 59 ...... 11

    A.  Defendants Instilled an "Us versus Them" Mentality in the Jury ........................ 12

    B.  Defendants Introduced Irrelevant and Prejudicial Issues to Stoke their "Us Versus Them" Appeal ............................................................................ 16

IV. CONCLUSION ................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*800 Adept, Inc. v. Murex Sec., Ltd.*,
  539 F.3d 1354 (Fed. Cir. 2008).........................................................................10

*Commil USA, LLC v. Cisco Systems, Inc.*,
  720 F.3d 1361 (Fed. Cir. 2013)................................................................. *passim*

*Hall v. Freese*,
  735 F.2d 956 (5th Cir. 1984) .................................................................... *passim*

*HRC Guam Co. v. Bayview II L.L.C.*,
  2017 Guam 25 (Guam Dec. 29, 2017)..................................................................14

*Irvan v. Frozen Food Exp., Inc.*,
  780 F.2d 1228 (5th Cir. 1986) ...............................................................12, 14, 19

*Jacobs v. Tapscott*,
  516 F. Supp. 2d 639 (N.D. Tex. 2007), *aff'd*, 277 F.App'x 483 (5th Cir. 2008).......................7

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
  863 F.2d 867 (Fed. Cir. 1988)............................................................................17

*Lake Charles Harbor & Terminal Dist. v. Reynolds Metal Co.*,
  No. 2:17-cv-1114, 2019 WL 638090 (W.D. La. Jan. 23, 2019).............................19

*Magnivision, Inc. v. Bonneau Co.*,
  115 F.3d 956 (Fed. Cir. 1997)......................................................................16, 17

*Samsung Elecs. Co. v. NVIDIA Corp.*,
  No. 3:14-cv-757, 2016 WL 754547 (E.D. Va. Feb. 24, 2016) ...............................15

*Sasaki v. Class*,
  92 F.3d 232 (4th Cir. 1996) ...............................................................................12

*SGS-Thomson Microelectronics, Inc. v. Int'l Rectifier Corp.*,
  31 F.3d 1177, 1994 WL 374451 (Fed. Cir. 1994) ................................................15

*Silbergleit v. First Interstate Bank of Fargo, N.A.*,
  37 F.3d 394 (8th Cir. 1994) .........................................................................18, 19

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) .............................................................................11

*Stollings v. Ryobi Techs., Inc.*,
  725 F.3d 753 (7th Cir. 2013) .............................................................................19

*VirnetX Inc. v. Apple, Inc.*,
    No. 6:12-cv-855, 2016 WL 4063802 (E.D. Tex. July 29, 2016) .............................................20

*Westbrook v. Gen. Tire & Rubber Co.*,
    754 F.2d 1233 (5th Cir. 1985) ...................................................................................12, 13, 20

*Whitehead v. Food Max of Miss., Inc.*,
    163 F.3d 265 (5th Cir. 1998) ....................................................................................12, 15, 20

**Rules**

Federal Rule of Civil Procedure 50(a)(1) ........................................................................1, 2

Federal Rule of Civil Procedure 59(a) ...........................................................................1, 11

Federal Rule of Evidence 802(d)(2)(C)-(D) .......................................................................19

## I.   INTRODUCTION

The only basis for the non-infringement verdict returned in this case was jury nullification.  Freshub, Inc. and Fresub, Ltd ("Freshub") provided overwhelming unrefuted evidence proving infringement with its expert witness, Dr. Medvidovic, Defendants' fact witnesses and Defendants' own documents.  In response, Defendants asked the jury to ignore the evidence because it was not right that an Israeli company acquired patents that directly read on an American company's technology, and other American companies would be next unless the jury stopped them.

Defendants failed to rebut Freshub's infringement proofs, including failing to address infringement by the doctrine of equivalents ("DOE") while its fact witnesses admitted that the Accused Alexa Products met the limitations of the Asserted Patents.  Defendants' only evidence regarding non-infringement was the incredulous testimony of their expert, Dr. Johnson, that was based on "special meanings" of terms present in every Asserted Patent, contrary to the Court's "plain and ordinary meaning" instruction.  Such evidence is legally insufficient and erroneous, requiring a renewed judgment as a matter of law ("JMOL") or at a minimum, a new trial on infringement and damages pursuant to Federal Rules of Civil Procedure 50(b) and 59(a).

The strength of Freshub's infringement evidence and the absence of any legally sufficient rebuttal evidence illustrates the jury nullification.  Defendants led the jury away from the substantial evidence with unfair tactics, wholly irrelevant to the issue of infringement.  They instilled an "us versus them" mentality in the jury, through impassioned pleas that "only you folks" can protect "*every U.S. technology company*" and the U.S. "constitutional patent system" from Freshub, a company founded and based in Israel.  Defendants ensured that such improper arguments would bias the jury by introducing irrelevant and highly prejudicial issues playing on Jewish stereotypes to argue that Freshub abused the U.S. patent system to "come to the courthouse and try to get rich."  The deployment of these tactics further warrants a new trial.

## II.   FRESHUB IS ENTITLED TO JMOL OF INFRINGEMENT

JMOL on infringement is appropriate because Freshub introduced overwhelming

unrebutted evidence that the Accused Alexa Products infringe, such that the jury had no legally sufficient evidentiary basis to find for Defendants.  Fed. R. Civ. P. 50(a)(1) (JMOL where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue.").  Specifically, Freshub admitted over 30 exhibits during Dr. Medvidovic's testimony, including videos of Dr. Medvidovic narrating how the Accused Alexa Products infringe (*see* PTX-210, PTX-219), Defendants' confidential technical information, and source code.  Freshub also introduced testimony of fact witnesses, Mr. Halim, a principal engineer at Amazon for 14 years (6/14/21 Trial Tr. 237:1-8), and Mr. Portman, a principal engineer at Amazon for the Amazon Shopping architecture (*see* 6/16/21 Trial Tr. 726:6-11) to establish infringement.  Defendants failed to rebut this evidence.  Instead, they presented two fact witnesses who only corroborated Freshub's infringement proofs and an expert that testified contrary to the Court's claim construction.  For these reasons, as detailed below, no reasonable jury should have found that Defendants do not infringe.

### A. Defendants Failed to Rebut Freshub's Substantial Evidence of Infringement for the '153 Patent

Freshub presented substantial evidence with Dr. Medvidovic's testimony and supporting exhibits, and the testimony of two Amazon engineers, demonstrating that Defendants' Accused Alexa Products infringe every element of Claims 1 and 6 of U.S. Patent No. 9,908,153 (JTX-1, "the '153 Patent").

Independent Claim 1 is a system consisting of two primary portions: a "first system configured to receive spoken words" and a second "computer system."  '153 Patent, Claim 1 (JTX-1, 14:46-47) (first system); *id*. at 14:65-15:12 (computer system).  Dr. Medvidovic explained how the Accused Alexa Products include both, and therefore infringe.  6/14/21 Trial Tr. 262:11-14 ("Alexa is a system that basically has two principal subsystems, one of them running on the device, and the second subsystem running on a server in the Amazon cloud"); *see also id*. at 270:2-271:12 (describing the first system which "basically corresponds to something like the Alexa device"); *id*. at 288:19-289:1 (describing the second system, "which is the servers

2

in the cloud"); *id.* at 272:11-18 (confirming that the Alexa products are a voice processing system configured to receive user spoken words); *id.* at 288:19-289:1.

The "first system" of Claim 1 includes a microphone, wireless network interface, digitizer, computer, and specific instructions stored in memory. '153 Patent, Claim 1 (JTX-1, 14:46-64); 6/14/21 Trial Tr. 270:24-271:5. Dr. Medvidovic testified that in the Accused Alexa Products, the "first system" is the Alexa devices, such as the Echo. 6/14/21 Trial Tr. 270:2-271:12. He identified, using Defendants' documents, that the Alexa devices have a microphone, wireless network interface, digitizer, computer and memory elements. 6/14/21 Trial Tr. 278:8-279:2 (identifying the microphone in Defendants' schematic (*e.g.*, PTX-333) by "an array of seven microphones"), *id.* at 280:14-281:3 (identifying the wireless interface, as shown in PTX-333), *id.* at 279:3-279:21 (identifying the digitizer, as shown in PTX-333, by analog-to-digital converters), *id.* at 279:22-280:13 (identifying the computer, as shown in PTX-333, by quad-core processors); *see also* PTX-329, PTX-336, PTX-335, PTX-207, PTX-355 (collectively, Defendants' schematics).

The instructions stored in memory of the "first system" cause it to "receive . . . a verbal order, comprising at least one item, from a user" and "immediately transmit, using the wireless network interface, the digitized order to a computer system remote from the first system." Dr. Medvidovic showed where the Alexa devices have memory with instructions to receive and digitize an order and explained that an order is immediately transmitted to the cloud, and that the cloud is the "computer system remote from the first system." *See* 6/14/21 Trial Tr. 286:17-287:6 (identifying the memory and its functionality, as shown in PTX-311, when a digital representation of a voice request is automatically sent onward to the cloud); *see also id.* at 282:18-283:9 (describing for the Alexa products that "[a] verbal order is something like: Alexa, add bananas to my shopping list," "[t]he item in that order is bananas," and the verbal order is converted to binary form and then transmitted); *id.* at 281:14-282:17.

The second computer system of Claim 1 must comprise "a network interface," "a second computer," and instructions to accomplish certain tasks. '153 Patent, Claim 1 (JTX-1, 14:65-

67); *see also* 6/14/21 Trial Tr. 287:19-288:12.  Dr. Medvidovic testified that Defendants' cloud servers (the "second system") include a network interface and the second computer.  6/14/21 Trial Tr. 289:2-6 (the Alexa system requires a network interface in order to function); *id*. at 289:7-291:1 (pursuant to PTX-370, the Alexa Back end is the "platform" and the network interface is the "in-bound gateway"); *id*. at 288:13-289:1 (explaining the Alexa system runs on computers which are servers in the cloud).  The instructions tell the second computer system to "receive . . . the digitized order from the first system; translate at least a portion of the digitized order to text; identify an item corresponding to the text; add the identified item to a list associated with the user; enable the list . . . to be displayed via a user display."  '153 Patent, Claim 1 (JTX-1, 15:1-12).  Dr. Medvidovic explained that these elements are met after the user says "Alexa, add bananas to my shopping list" and the utterance is "digitized and sent on through the device's own network interface."  6/14/21 Trial Tr. 291:11-25; *see also id*. at 305:1-8.  He also explained how Defendants' documents (*e.g.*, PTX-370) show that the Alexa devices send the digitized version of the user's utterance to the automatic speech recognition ("ASR") and natural language understanding ("NLU") components, generate the user's intent, and then forward that intent to the shopping skill which displays the item on the user's shopping list.  *Id*. at 293:22-295:1; *see also id*. at 297:6-298:7 (testifying that checking off items from a shopping list requires matching and recognizing, as shown in PTX-425); *see also*, *e.g.*, PTX-370, PTX-314, PTX-425, PTX-345 (Defendants' technical documents).

For the "the list to be provided to the user via a website" element in Dependent Claim 6, Dr. Medvidovic identified a webpage in an internal Amazon document, displaying "the Alexa shopping list for this user.  It has milk, wine, Hot Cheetos, and bread."  '153 Patent, Claim 6; *see also* 6/14/21 Trial Tr. 306:5-307:12; PTX-348.

In addition to Defendants' confidential technical and source code documentation, Dr. Medvidovic presented an animation of Defendants' technical documents identifying each element of the '153 Patent in the Accused Alexa Products.  6/14/21 Trial Tr. 267:5-270:1; 284:19-286:1; 305:9-306:4.  He relied on the testimony of Defendants' witnesses, establishing

that the features of Claim 1 of the '153 Patent are found in the Accused Alexa Products.  *See id.* at 302:2-304:25 (explaining how Messrs. Halim and Portman's testimony informed his opinions for the translate-to-text, intent, identify, add-to-list, and display elements of Claim 1 of the '153 Patent), *id.* at 236:24-239:12 (Halim testimony), *id.* at 249:2-11 (Portman testimony).  Thus, Freshub in its case-in-chief proved infringement on an element-by-element basis.

The overwhelming evidence of infringement did not end with Freshub's case-in-chief. During cross-examination, Defendants' first fact witness, Dr. Strom, a Vice President and Distinguished Scientist of the Alexa Artificial Intelligence Organization, admitted infringement. His trial testimony juxtaposed to Claim 1 proves that the Accused Alexa Products satisfied every element of Claim 1, such that the jury could not reasonably have found non-infringement:

| '153 Patent, Claim 1 | Dr. Strom's Testimony |
|---|---|
| A voice processing system comprising: a first system configured to receive user spoken words comprising: | Q. Yes or no, sir, would you agree that the Alexa products and the Alexa system, they form a voice processing system? A. It is one thing that they do, yes. (6/16/21 Trial Tr. 689:8-10) |
| a microphone; | Q. Okay. And the Alexa products, they include a microphone, correct? A. That's correct. (6/16/21 Trial Tr. 690:2-4) |
| a wireless network interface; | Q. The Alexa products, they include a wireless network interface, correct? A. That's correct. (6/16/21 Trial Tr. 690:5-7) |
| a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation; | Q. The Alexa products, they include a digitizer that can digitize a user's spoken words into a digital representation, correct? A. That's correct. (6/16/21 Trial Tr. 690:8-11) |
| a first computer; non-transitory memory that stores instructions that when executed by the first computer cause the first system to perform operations comprising: | Q. And now, the Alexa products, let's say the Echo right there, that's a computer. It includes a processor and memory, correct? … A. So let's see, you asked -- you asked several different things. You asked if it's a computer -- . . . Q. -- that includes processor and memory. A. It has a processor, it has memory – (6/16/21 Trial Tr. 689:12-24) |
| receive via the digitizer a verbal order, comprising at least one item, from a user, wherein the verbal order was | Q. The spoken order that's received by ASR, so the spoken |

| captured by the microphone and digitized by the digitizer; | order that we -- I was just asking you about, that comes<br>into ASR --<br>A. Yeah.<br>Q. – that's a digitized format, correct?<br>A. Yes. (6/16/21 Trial Tr. 693:4-9) |
|---|---|
| immediately transmit, using the wireless network interface, the digitized order to a computer system remote from the first system; | Q. At the very least -- so you're saying that the Alexa -- the Alexa products can't transmit the digitized representation of speech to the Alexa system?<br>A. It transmits the speech, that's correct.<br>(6/16/21 Trial Tr. 690:17-20) |
| the computer system, the computer system comprising: | Q. Okay. And now, the Alexa system, the servers, those are computers, right?<br>A. Correct, yes. (6/16/21 Trial Tr. 690:21-23) |
| a networks interface; | Q. They also include a network interface to receive that digitized speech, correct?<br>A. Yes. (6/16/21 Trial Tr. 690:24-691:1) |
| a second computer;<br>non-transitory memory that stores instructions that when executed by the second computer cause the computer system to perform operations comprising: | Q. And now, those computers, they contain memory, right?<br>A. That's correct. (6/16/21 Trial Tr. 691:2-3) |
| receive, using the network interface, the digitized order from the first system; | Q. And the Alexa system, it can receive that digitized speech from, for instance, the Echo device, right?<br>A. Yes. (6/16/21 Trial Tr. 691:4-6) |
| translate at least a portion of the digitized order to text; | [Q.] The spoken order that's received by ASR, it's in audio format, correct?<br>[A.] That's right. Yes.<br>[Q.] What's outputted is text, correct?<br>[A.] That's correct. (6/16/21 Trial Tr. 693:17-23) |
| identify an item corresponding to the text;<br>add the identified item to a list associated with the user;<br>enable the list, including the identified item, to be displayed via a user display. | Q. Okay. But my question is: If I say, "add milk to my shopping list," and once that gets processed, that item, "milk," will be added to the user's shopping list, correct?<br>A. The item will be using -- yes, if the system does the right thing, an item, "milk," will be added, yes. (6/16/21 Trial Tr. 696:6-10) |

Defendants' witness, John Love, the first employee of Alexa Shopping, also confirmed that the Accused Alexa Products receive, recognize, transmit and display "orders."  *See* 6/16/21 Trial Tr. at 721:10-21, 722:9-723:8, 724:15-16.

Further, Defendants did not rebut DOE at all, such that Freshub's infringement under DOE was unchallenged for the '153 Patent.  Dr. Medvidovic explained how the "identify" element is met under DOE because the Accused Alexa Products "basically [] figure out which part of the user's utterance corresponds to the specific thing that needs to be included in the shopping list," "rel[y] on the textual characterization . . . to figure out what element is actually important . . . like apples," and "the output of that process would be substantially the same result which would be the addition of that element to a shopping list."  *See* 6/14/21 Trial Tr. 307:13-309:17.  Thus, JMOL is appropriate because Freshub presented infringement evidence amounting to "facts and inferences [that] point so strongly and overwhelmingly in [Freshub]'s favor that reasonable jurors could not reach a contrary verdict."  *See Jacobs v. Tapscott*, 516 F. Supp. 2d 639, 643 (N.D. Tex. 2007), *aff'd*, 277 F.App'x 483 (5th Cir. 2008) (granting JMOL where evidence insufficient to support verdict) (citation omitted).

### B.    The Jury Only Had Substantial Evidence of Defendants' Infringement of the '408 Patent

Freshub also provided substantial evidence demonstrating that Asserted Claims 20 and 30 of U.S. Patent No. 10,232,408 (JTX-3, "the '408 Patent") are literally infringed.  Claims 20 and 30 are substantially the same, except that Claim 20 is a method and Claim 30 is a non-transitory memory claim.  *See* 6/15/21 Sealed Trial Tr. 3:22-4:1.  As Dr. Medvidovic explained, these claims are "from the perspective of the server system that runs in the cloud."  6/14/21 Trial Tr. 316:12-16.

First, Dr. Medvidovic provided an animation of Defendants' technical documents that identified where each of the infringing elements are in the Accused Alexa Products.  6/14/21 Trial Tr. 267:5-270:1; 313:4-315:5.  The first step of Claim 20 deals with "receiving a digitized order from a remote system where the user uses spoken words and that remote system comprises a microphone, a wireless network interface, and a digitizer."  *Id.* at 316:2-11.  This is essentially the first computer system of Claim 1 of the '153 Patent and Dr. Medvidovic confirmed that the same evidence he pointed to for the front-end aspects of the '153 Patent also prove that the

Accused Alexa Products meet this element of Claim 20.  *Id*. at 316:17-317:11.  He testified similarly with respect to the "translating" element.  *Id*. at 317:12-318:1.  In PTX-318, Defendants' confidential document, he pointed out that Defendants' ASR "[c]onverts speech to its text representation."  6/14/21 Trial Tr. 318:4-15.  He also relied on Mr. Portman's testimony for showing that the Accused Alexa Products translate speech to text.  *Id*. at 318:16-20.

Claim 20 next requires "matching" the text to a "text description associated with a unique product identifier" and "based at least in part on the unique product identifier . . . identifying . . . an item corresponding to the text."  '408 Patent, Claim 20 (JTX-3, 16:14-21).  The item is then "placed on an item set associated with the user" and displayed to the user.  '408 Patent, Claim 20 (JTX-3, 16:22-26).  Dr. Medvidovic identified the Intelligence Choice Engine ("ICE") of Alexa that matches the translated text to a text description associated with a unique product identifier.  *See* 6/14/21 Trial Tr. 318:21-326:8.  ICE runs searches and returns ranked results, according to Defendants' documents describing the process.  *See* PTX-322, PTX-325, PTX-358.  For the "identifying" step, Dr. Medvidovic explained the Accused Alexa Products identify an item corresponding to the translated text because they run searches for items, return relevant ranked results, and display the top item, along with information about the product, to the user.  *See* 6/14/21 Trial Tr. 327:5-331:6; *see also* PTX-365.

Finally, he proved using Defendants' documents that the Accused Alexa Products cause the identified item to be placed on an item set associated with the user when items are added to cart and then enable the item set to be displayed via a remote user display because the item set can be displayed on a website on the user's phone.  *See* 6/14/21 Trial Tr. 331:7-332:20; 332:21-335:8; *see also* PTX-365, PTX-216.

Mr. Portman's testimony, on which Dr. Medvidovic relied, established that the Accused Alexa Products satisfy the "matching," "identifying," and "causing to be placed on an item set" elements.  *See* 6/14/21 Trial Tr. (Portman testimony) 246:10-16 (the Alexa backend produces a "*matched list* of all somehow relevant results" to keyword banana in the "buy bananas" example); *id.* at 250:5-11 (confirming that in "buy apples" example, "apples is going to be

8

identified" by searching various indices); *id*. at 251:15-20 ("apples will be added to the customer grocery cart").

For Claim 30, which is a non-transitory memory claim, but otherwise substantially the same as Claim 20 (6/15/21 Sealed Trial Tr. 3:22-4:1), Dr. Medvidovic identified where in Defendants' highly confidential source code that the instructions stored in the non-transitory memory are found.  *See*, *e.g.*, *id*. at 4:22-20:5; *see also* PTX-370, PTX-362, PTX-516.

## C.   The Jury Only Had Substantial Evidence of Defendants' Infringement of the '801 Patent

Freshub proved that Claim 1 of U.S. Patent No. 10,213,810 (JTX-2, "the '810 Patent") is infringed.  It is a voice processing system substantially the same as the '153 and '408 Patents, requiring "a networks interface," "a computer," and memory elements.  '810 Patent, Claim 1 (JTX-2, 14:48-15:7).  Relying on the same supporting evidence used for the '153 and '408 Patents (*i.e.,* schematics, testimony, confidential technical documents, and source code), Dr. Medvidovic confirmed that the Accused Alexa Products infringe those common elements. 6/15/21 Trial Tr. 343:13-346:1 (testifying that the microphone, digitizer, wireless network interface, receive, translate, use, include, and enable elements are met).  He then explained that the unique elements of the '810 Patent are the "associate," "download," and "enable" elements. 6/15/21 Trial Tr. 346:3-352:18.  He testified that the Accused Alexa Products have instructions to associate a unique identifier with a remote system configured to receive the user's spoken words because each device is given a serial number.  *See* 6/15/21 Trial Tr. 345:2-347:23; PTX-423.  Further, he explained using Defendants' documents that the Accused Alexa Products have instructions to download configuration data to the remote system because to set up a device, the Alexa backend sends configuration data to update how to route data.  *See* 6/15/21 Trial Tr. 347:21-349:22; PTX-414.  Finally, he testified that the Accused Alexa Products include the required instructions to enable because they send instructions to a provider to provide the item. 6/15/21 Trial Tr. 349:23-352:17; PTX-425.

**D.      Defendants' Fact Witnesses Admitted that the Three Claim Elements of Defendants' Non-Infringement Defense Are in the Accused Alexa Products**

The sum total of Defendants' non-infringement defense was that the Accused Alexa Products allegedly do not receive "orders" as recited in the Asserted Claims, that they do not "identify an item" as set forth in the '153 Patent and do not "match" an item to a text description as recited in the '408 and '810 Patents.  6/17/21 Trial Tr. 870:5-22 (Dr. Johnson summarizing his non-infringement conclusions).  Defendants' only witness to testify on non-infringement was Dr. Johnson, who could only manufacture such farfetched claims by applying a special meaning to the claim terms "order" and "item."  Dr. Johnson's opinion was, however, critically flawed because it was based on a legally improper claim construction.  The Court instructed the jury to apply the plain and ordinary meanings of the all claim terms.  Dkt. No. 247 at 12, 13 (Final Jury Instruction No. 2.7).  Dr. Johnson, however, testified that he applied "special meaning" to the terms "verbal order" and "item."  6/17/21 Trial Tr. 1053:2-13 (agreeing that the term "verbal order" has special meaning in his non-infringement analysis and is "not the colloquial 'take out the trash, add to my shopping list'"); *id.* at 1053:14-1054:10 (agreeing that the term "item" had special meaning in his testimony regarding non-infringement and is "not any item, milk, eggs, whatever").  Thus, the jury's finding of non-infringement had to be based on Dr. Johnson's incorrect claim construction, because either "verbal order" or "item" is a component of every element Dr. Johnson challenged (or alternatively, jury nullification, as explained below).  Because the Federal Circuit requires granting JMOL where a jury verdict regarding infringement is based on incorrect claim construction and where no reasonable jury could have reached the jury's conclusion applying the proper claim construction, the Court should grant Freshub's JMOL.  *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1366 (Fed. Cir. 2008) (reversing JMOL denial where no reasonable jury could have found infringement under the proper claim construction).

Indeed, Dr. Johnson had no choice but to use a "special meaning"—Defendants' witnesses testified that the Accused Alexa Products satisfied these elements under the Court's

plain and ordinary meaning constructions.  For example, as demonstrated above, Defendants'

Vice President and Distinguished Scientist of the Alexa Artificial Intelligence Organization, Dr.

Strom, admitted on cross-examination that every of element of Claim 1 of the '153 Patent is met

and agreed that "milk" is an "item."  *See supra*, Section II.B; *see also* 6/16/21 Trial Tr. 696:6-10.

In addition to Dr. Strom's testimony, Mr. Love testified, using the plain and ordinary meaning of

the term "order," that the Accused Alexa Products receive, recognize, transmit and display

"orders."  *See* 6/16/21 Trial Tr. 721:10-21, 722:9-723:8 (testifying as to what happens after a

user says "Alexa, order dog food").  And Mr. Portman explained that the Accused Alexa

Products "match" an item to a text description.  6/14/21 Trial Tr. 244:10-14 (confirming that a

query for bananas will search "title" and "descriptions" of items), 246:2-16 (stating that the

results of the search will be a "matched list of all somehow relevant results to this banana

keyword").  Thus, no reasonable jury could have found non-infringement based on the actual

evidence of infringement.

## III.    ALTERNATIVELY, FRESHUB REQUESTS A NEW TRIAL UNDER RULE 59

The Court has discretion to grant a new trial "based on its appraisal of the fairness of the

trial and the reliability of the jury's verdict."  *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-

13 (5th Cir. 1985).  A new trial is warranted where, as here, "the verdict was against the great

weight of the evidence;" "the trial was unfair;" or "prejudicial error was committed in its course."

*Id.* (citations omitted).[1]  All three independent bases for granting a new trial are present here, and

a partial new trial on infringement and damages is necessary to avoid manifest injustice.

The jury declined to find infringement despite Freshub's overwhelming evidence of it.

*Supra* Section II.  For this reason alone, a new trial is warranted because "the verdict was against

the great weight of the evidence."  *Smith*, 773 F.2d at 612-13.  Further, "[g]iven the strength of the

plaintiff's evidence" regarding infringement, the jury's incongruous verdict "strongly indicates

---

[1] Regional circuit law governs motions for new trial in patent cases.  *Commil USA, LLC v. Cisco
Systems, Inc.*, 720 F.3d 1361, 1370 (Fed. Cir. 2013).  Further, courts may grant a partial new trial
on infringement and damages only, since validity is a "distinct and separable" issue.  *Id*. at 1371.

that the jury's deliberation in this case was not impartial." *Hall v. Freese*, 735 F.2d 956, 959-60 (5th Cir. 1984) (new trial required to correct substantial injustice resulting from counsel's prejudicial remarks). Indeed, as set forth below, Defendants implanted an "us versus them" mentality in the jury and made other inflammatory and highly prejudicial statements that succeeded in encouraging jurors to find no infringement for reasons wholly external to the merits of the case. *See id*. at 962; *see also Irvan v. Frozen Food Exp., Inc*., 780 F.2d 1228, 1231 (5th Cir. 1986) (verdict demonstrated success of improper remarks); *Sasaki v. Class*, 92 F.3d 232, 237 (4th Cir. 1996) (verdict itself provides compelling evidence that improper comments substantially influenced the jury's verdict, and thus were not harmless).

### A.   Defendants Instilled an "Us versus Them" Mentality in the Jury

Throughout trial, Defendants advanced "us versus them" arguments along national and religious lines that biased the jury. It is well-established that Defendants' tactic is impermissible and warrants a new trial, since verdicts "influenced by passion and prejudice are the antithesis of a fair trial." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 276-77 (5th Cir. 1998) (ordering new trial when counsel appealed to emotion and local bias). Comments meant to appeal to "community conscience" by "pitting 'the community' against a nonresident corporation" are plainly improper. *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985). An improper "community conscience" plea is not limited to "specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation. Such appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders." *Id*. at 1238-39. Defendants repeatedly made such improper pleas that they ultimately cemented and tied together during closing arguments.

Defendants told the jury that a finding in their favor was necessary to prevent Freshub—a company based and founded in Israel by CEO, Meir Zohar —from suing and "taking" from other U.S. companies. This was done through different statements over the course of trial that collectively prejudiced the jury against Freshub, particularly statements made in closing that this

case was an attack on U.S. companies from outside forces.  For example, Defendants argued that this case was the "***tip of the iceberg***" of a foreign company's lawsuits against "***[e]very U.S. technology company <u>they</u> can find***," that "***[o]nly you folks can stop***."  *See* 6/21/21 Trial Tr. 1436:3-25 (emphasis added); 6/14/21 Trial Tr. 67:11-17, 65:15-19 (emphasis added) (emphasizing at the outset that Freshub is an Israeli company).  Defendants' impassioned and prejudicial plea appeals to the jury's patriotic duty and sense of national identity to view a verdict in Defendants' favor as being in the best interest of the U.S. against a foreign threat.  "This us-against-them plea can have no appeal other than to prejudice by pitting 'the community' against a nonresident corporation.  Such argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial."  *Westbrook,* 754 F.2d at 1238.

But Defendants' improper "us versus them" arguments did not stop there.  Defendants urged the jury to find in their favor to protect the U.S. patent system itself from Freshub "going to the courthouse" to enforce its patents.  In other words, Defendants exacerbated their tactic of pitting the community against a foreign company—which alone is improper and warrants a new trial—by encouraging the jury to see their verdict as an opportunity to send a policy message that is extraneous to the merits of the case.  In their opening remarks, Defendants stated:

> [R]ather than do what normal companies do, invest thousands of hours in research and development and invest millions of dollars in research and development, going to the courthouse is a quick way to succeed.  ***I'm going to submit to you that's not why our constitutional patent system was set up.  It's going to be your decision to decide that***, but I'm going to submit to you that's not why it's there.  They said the shareholders will not see any money at that time, but they will see money after we sue Google and Apple.  So it's clear, ***this is the tip of the iceberg***.

6/14/21 Trial Tr. 67:6-17 (emphasis added).  In their closing remarks, Defendants repeated their improper plea:

> So rather than doing this the normal way through hard work and innovation, ***we're going to go to the courthouse***.  ***And that's why we're here***, because this conduct needs to stop.  This is not what the patent system was designed for.  ***The preservation of this constitutional patent system and the integrity of it is -- is at play.  And this is not what it's about, and this needs to stop.  And one of the***

***reasons it needs to stop is because we know this is the tip of the iceberg.*** That's not me saying it.  That's Mr. Zohar saying it.  Who comes next?  Google, Apple, dot, dot, dot.  ***Every U.S. technology*** company ***they*** can find.  ***And that's why we're here.  I can't stop it.  Amazon can't stop it.  Only you folks can stop it.  And that's what we'd ask you to do.***

6/21/21 Trial Tr. 1436:12-25 (emphasis added); *see also id*. at 1403:6-14 ("The patent system wasn't created to print patents.  It wasn't created to generate lawsuits.  It was created to advance science and technology.").

Defendants told the jury that they were there to make a policy decision about patent enforcement under the U.S. "constitutional patent system," which, of course, is not what the jury was there to decide.  These comments were "a conscious and deliberate appeal to the prejudice and passion of the jury: the jurors were asked to judge this case, not on the basis of whether the defendant [infringed], but on the basis of their disapproval of [Freshub's] legal right" to enforce its patents in court.  *Irvan*, 780 F.2d at 1231; *see also, e.g.*, *HRC Guam Co. v. Bayview II L.L.C.*, 2017 Guam 25, ¶¶ 99-100 (Guam Dec. 29, 2017) (appeal to jury to send a message to outsiders about the proper way to do business was "in and of itself . . . improper" and "compounded" by highlighting a local versus foreigner theme).

Worse still, Defendants' tactic—arguing that the motive of an Israeli company and its Jewish founder and CEO, Mr. Zohar, to "go to the courthouse [as] a quick way to succeed" was an abuse of the patent system designed to "take" from Defendants and others—plays on Jewish stereotypes.  Defendants blew this Jewish stereotype "dog whistle" at every opportunity to unfairly bias the jury, whether it was how much money the Jewish founders and company executives would make (the "greedy" stereotype) if the jury returned a verdict for Freshub, or emphasizing irrelevant facts about Freshub's lack of profitability (and doing so in terms of Israeli shekels).  *See, e.g.*, 6/14/21 Trial Tr. 62:17-22, 63:18-20, 66:5; 6/15/21 Trial Tr. 429:19-431:25, 592:7-17; 6/21/21 Trial Tr. 1320:10-17; *see also* 6/15/21 Trial Tr. 595:14-596:5, 596:6-9, 597:7-17, 598:9-12, 599:19-23 (all referencing that Mr. Douer would make "some $120 million plus").

Comments such as these that "perpetuate the stereotype of Jewish people as greedy opportunists" justify a new trial.  *Commil*, 720 F.3d at 1369 (curative instruction insufficient to

14

address prejudice from repeated use of a greedy Jewish stereotype); *see also Hall*, 735 F.2d at 960 (introduction of racial stereotypes warrants new trial).  Simply, Freshub's motives to assert its patents are irrelevant.  *Samsung Elecs. Co. v. NVIDIA Corp.*, No. 3:14-cv-757, 2016 WL 754547, at *4 (E.D. Va. Feb. 24, 2016) (patentee's motive for bringing lawsuit is irrelevant and unfairly prejudicial) (citation omitted); *SGS-Thomson Microelectronics, Inc. v. Int'l Rectifier Corp.*, 31 F.3d 1177, 1994 WL 374451, at *6 (Fed. Cir. 1994) (motive for assigning patents is irrelevant). Defendants' gratuitous commentary placed motive front and center for the jury, improperly suggesting it was a relevant consideration and feeding the "greedy opportunist" stereotype.

In the same vein, Defendants told the jury to view the amount of damages sought as evidence of "what a lawsuit is really about," *i.e.*, misuse of the patent system to make money. 6/14/21 Trial Tr. 73:18-21 (in opening argument); 6/21/21 Trial Tr. 1426:4-11 (in closing argument).  Defendants said that Mr. Zohar "***cooked up***" a plan "***to come to the courthouse and try to get rich***" against "every U.S. technology company ***they*** can find."  6/21/21 Trial Tr. 1436:3-25 (emphasis added).  Defendants' inflammatory remarks, which have nothing to do with whether Defendants infringe, played on the stereotype of greedy Jewish executives of an Israeli company allegedly taking advantage of U.S. companies, to trigger religious biases and deepen the "us vs. them" nationalistic divide in the minds of the jurors.  Even if counsel did not specifically intend to invoke religious or ethnic prejudices, these comments were made "to prejudice the jurors against [Freshub] and [its] attorneys."  *Hall*, 735 F.2d at 960 (court need not find that racial prejudice was specifically intended to grant new trial).

Defendants' arguments worked by directing the jury's focus away from the elements of the case to an extraneous and inflammatory consideration, and deprived Freshub of a fair trial.  To find that manifest injustice would result from allowing the verdict to stand in view of Defendants' improper remarks, the Court "need not find that each statement, taken individually, was so improper as to warrant a new trial."  *Whitehead*, 163 F.3d at 278.  Rather, the cumulative impact of Defendants' numerous prejudicial comments must be considered "as a whole."  *Id.*; *Commil*, 720 F.3d at 1369-70 (affirming grant of new trial based on counsel's pervasive appeals to religious

and foreign prejudices).  Indeed, Defendants used every device available to them—demonstratives, opening arguments, cross and direct examinations, and closing arguments—to drill their improper theme into the jurors' understanding of the case.  Collectively, Defendants' tactics had an overwhelming impact that succeeded in nullifying the jury.  Maintaining the jury's nullified verdict on infringement would result in manifest injustice.

### B.   Defendants Introduced Irrelevant and Prejudicial Issues to Stoke their "Us Versus Them" Appeal

Defendants ensured that their national and religious "us versus them" appeal persuaded the jury by introducing irrelevant and highly prejudicial issues concerning patent prosecution and enforcement to advance their improper story that Freshub and its Israeli executives misused the U.S. patent system to "take" from Defendants and other U.S. technology companies—and by going so far as to violate the Court's rulings to make sure that the jury heard such issues.  Defendants' conduct demonstrates unfair prejudice.  *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 961 (Fed. Cir. 1997) (new trial required; defendant's emphasis of irrelevant allegations of improper patent prosecution with "assertions and innuendos of impropriety [that] were magnified by repetition" demonstrate unfair prejudice) (citations omitted).

First, Defendants suggested at least 19 times that the filing dates of the Asserted Patents indicate wrongdoing, despite this assertion being contrary to law:

> [A]s you go through and listen to the evidence in this case, ask yourself whether or not this process is really promoting science.  ***The patent system wasn't set up for someone to file patents four or five years after someone else has already introduced a product*** in an attempt to claim that you had the solution a decade ago when you really didn't.  The patent system wasn't set up to try to reach out and grab the hard work of engineers and scientists who spent thousands of hours developing something like an Alexa system using deep neural networks, using far-field speech recognition, and ***grab that for quick success in the courtroom***.

*See* 6/14/21 Trial Tr. 74:3-21 (quotation from 74:9-21) (emphasis added).

> The patent system is truly to promote the progress of science…. ***This timeline that you've seen many times is not in keeping with promoting science.***  Writing patent claims years after the product comes out and claiming that your patent includes voice shopping technology and Alexa all the way back to 2005 doesn't promote the

> progress of science.  It does just the opposite.  **It takes from others who have put in hard work and dedication and innovation. It takes from them.**

6/21/21 Trial Tr. at 1432:25-1433:10 (referring to the timeline of when the Asserted Patents were filed relative to their parent application) (emphasis added); *see also, e.g.*, Trial Tr. at 68:3-70:5, 70:11-71:3, 74:9-21, 114:1-115:12, 116:8-118:8, 184:5-18, 185:7-10, 355:11-360:22, 594:22-595:10, 898:23-899:8, 901:10-13, 1404:15-1406:5, 1411:1-10, 1411:16-19, 1419:5-1421:5, 1432:16-1434:10, 1435:7-1436:25.  Defendants' counsel also improperly opined that the timeline of this case was "strange" and "bizarre."  6/21/21 Trial Tr. 1404:15-19, 1419:5-13.

However, the dates that Ikan filed the continuation applications for the Asserted Patents were irrelevant; indeed, Defendants did not introduce them for any relevant purpose.  Rather, Defendants used the dates to (i) mislead the jury into thinking there can be no infringement since the Accused Alexa Products existed before the continuation applications were filed, and (ii) fuel their highly prejudicial and improper suggestion that Freshub misused the U.S. patent system to "take" from Defendants.  *See Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) ("there is **nothing improper, illegal or inequitable** in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application . . .  its genesis in the marketplace *is simply irrelevant*.") (emphasis added) (citation omitted); *Magnivision*, 115 F.3d at 961 (repetition of irrelevant alleged prosecution irregularities with "assertions and innuendos of impropriety" during trial demonstrates unfair prejudice).

Second, during closing argument, Defendants fabricated a story—entirely outside the evidentiary record—that Freshub's patent attorney drafted claims to match the Accused Alexa Products.  *See* 6/21/21 Trial Tr. 1419:5-1421:5.  Defendants' argument was intended to prejudice the jurors and advance their improper story that Freshub misused the patent system to "take" from Defendants.  *See Hall*, 735 F.2d at 961-62 (abuse of discretion to deny new trial where defendant

made remarks along geographic and racial lines "to prejudice the jurors" and "argu[ed] outside the record" which does not "serve any remote purpose for which a trial is intended.").

Third, furthering their improper "community conscience" pleas, Defendants argued to the jury that their community would not understand or approve of a verdict in Freshub's favor because there was no evidence related to conception or reduction to practice. *See* 6/21/21 Trial Tr. 1434:7-1436:11 ("So you're going to have to say to your spouse or friend: We don't know how this invention came about. And they're going to walk away scratching their head. And I would say, rightly so."); *id*. at 1433:20-24; *id.* at 1405:10-1406:2 (arguing jury did not see lab notebooks or prototypes made "along the way"). However, such facts were not introduced because Defendants agreed to a 2005 priority date, subject only to their written description defense. *See, e.g.*, Dkt. No. 247 at 23, 27, 30 (Final Jury Instruction Nos. 2.16, 2.18, 2.20) (December 12, 2005 priority date); 6/21/21 Trial Tr. 1335:21-1336:2 (priority date dispute limited to written description). However, Defendants did not raise this in the context of that defense, but instead misleadingly argued during closing that the absence of this evidence shows that Freshub misused the patent system. *See id.*; *see also* 6/21/21 Trial Tr. 1435:16-1435:18 (arguing that "one thing you'll find in every case is ***the most important evidence in a case is not what you see but what you don't see***") (emphasis added).

Fourth, Defendants introduced highly prejudicial hearsay from Mr. Zohar's deposition about named-inventor Sony Douer's supposed attempt to "dodge service" of a subpoena, which compounded the prejudicial effect of Defendants' tactics. Notably, Defendants introduced this hearsay—which was designated for their case-in-chief—during their cross-examination of Freshub's damages expert, in an effort to ensure that the jury heard the prejudicial content. *See* 6/15/21 Trial Tr. 599:9-600:1. Knowing that Freshub objected to Defendants' designation of Mr. Zohar's testimony (and the Court would rule on those objections outside the jury's presence), Defendants ensured "the cat would be out of the bag" by introducing the hearsay in a wholly irrelevant line of cross-examination. Defendants' calculated effort to ensure that the jury would hear prejudicial hearsay is improper. *See Silbergleit v. First Interstate Bank of Fargo, N.A.*, 37

F.3d 394, 397-98 (8th Cir. 1994) (ordering new trial and admonishing counsel's use of questions to place prejudicial information before jury).[2]

Furthermore, Mr. Douer's conduct with respect to his subpoena is irrelevant and was introduced solely to distract and prejudice the jury. Indeed, Defendants incorporated the hearsay into their improper "community conscience" appeal to the jury during closing argument. *See,* 6/21/21 Trial Tr. at 1434:1-10; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 762 (7th Cir. 2013) (improper admission of hearsay and use during opening statements was prejudicial); *Irvan*, 780 F.2d at 1231 (admission of irrelevant evidence "compounded" prejudicial effect of defendant's appeals to the prejudice and passion of the jury).

Finally, Defendants repeatedly referred to the abandonment of the parent application to the Asserted Patents, and misleadingly suggested that it was intentional to further their improper narrative about Freshub's misuse of the patent system; namely, to enforce an abandoned patent. *See, e.g.*, 6/14/21 Trial Tr. 70:2-5 ("[I]n 2012, Ikan actually abandoned the patent. That's sort of an official process or procedure under the patent rules, and they abandoned that patent."); *id.* at 115:7-14 ("this patent that was filed for back in December of 2005, went abandoned -- it was abandoned"); *see also id.* at 114:5-11, 114:20-115:1, 117:25-118:4. The Court initially overruled Freshub's objections, but on the fourth day of trial, the Court recognized that Defendants' repeated references to abandonment were irrelevant and prejudicial and ruled that Defendants could no

---

[2] The Court overruled Freshub's hearsay, relevance, and prejudice objections (6/15/21 Trial Tr. 598:21-600:1) on the mistaken belief that Mr. Douer is a party opponent (*id.* at 652:3-5), notwithstanding that Defendants made no such showing as required under Fed. R. Evid. 802(d)(2)(C)-(D). Mr. Douer is Ikan's principal, and Ikan is the majority (but not the sole) shareholder of Freshub. Neither Ikan nor Mr. Douer is a party, and Mr. Douer is not involved in Freshub's business, and is not its agent. *See e.g.*, *Lake Charles Harbor & Terminal Dist. v. Reynolds Metal Co.*, No. 2:17-cv-1114, 2019 WL 638090, at *3 (W.D. La. Jan. 23, 2019) (excluding hearsay by third party; there was no evidence that it "may be treated as the same entity as [defendant] for any reason"); *id.* at n.2 (proponent of hearsay offered no evidence that "distinct corporate entit[y]" "was authorized … to make these statements or was an agent or employee of [defendant]").

longer refer to it.[3]   A new trial is warranted for this reason alone, given that the impact of Defendants' repeated reference to abandonment "could not be fully appreciated until it was given context within the trial." *VirnetX Inc. v. Apple, Inc.*, No. 6:12-cv-855, 2016 WL 4063802, at *5 (E.D. Tex. July 29, 2016) (granting new trial, noting that the court could not have anticipated how a prior verdict would be over-used to prejudicial effect).

Although the Court issued a curative instruction, it was insufficient because the jury had already heard about the abandonment multiple times.  *See, e.g.*, *Commil*, 720 F.3d at 1369-70 (curative instruction on irrelevant interjections of counsel insufficient to address use of religious stereotypes).  Even more troubling, after the curative instruction had been read, Defendants **twice** referenced the abandonment (and suggested that it was intentional) in violation of the Court's order.  *See* 6/21/21 Trial Tr. 1404:25-1405:9 ("that patent application on a refrigerator that Ikan **later gave up**"); *id.* at 1411:16-19 ("that patent application on the refrigerator **that they gave up**") (emphasis added).  Thus, Defendants nullified any limited curative effect of the instruction.  *See Whitehead*, 163 F.3d at 277-78 (additional improper remarks following curative instructions rendered them insufficient to address prejudice).  As a result, Defendants used the abandonment to further prejudice the jury and instill their improper pleas.

Taken together, Defendants' improper remarks permeated the trial and "so exceeded the limits of advocacy as to cause a prejudicial verdict." *Westbrook.*, 754 F.2d at 1238.  Because manifest injustice would result from permitting the verdict to stand, the Court should order a new trial on the issues of infringement and damages.

## IV.   CONCLUSION

Freshub respectfully requests that the Court grant its JMOL or a new trial.

---

[3] *Compare* 6/14/21 Trial Tr. 10:15-18:24 (reference to abandonment permitted) *with* 6/17/21 Trial Tr. 819:1-6 (excluding abandonment).  At the June 17th charge conference, the Court found abandonment irrelevant in agreeing to Freshub's requested curative jury instruction on the issue and excluded further evidence relating to it, which Defendants acknowledged.  6/21/21 Trial Tr. 1162:19-1163:1 (acknowledging evidence of "abandonment issue" was excluded for lack of relevance); *see also id.* at 1334:21-1335:2.

Respectfully submitted,

Dated: August 11, 2021                    By: */s/ Lisa Kobialka*
                                          Paul J. Andre (*Pro Hac Vice*)
                                          Lisa Kobialka (*Pro Hac Vice*)
                                          James Hannah (*Pro Hac Vice*)
                                          KRAMER LEVIN NAFTALIS
                                           & FRANKEL LLP
                                          990 Marsh Road
                                          Menlo Park, CA 94025
                                          Telephone: (650) 752-1700
                                          Facsimile:  (650) 752-1800
                                          pandre@kramerlevin.com
                                          lkobialka@kramerlevin.com
                                          jhannah@kramerlevin.com

                                          John Palmer
                                          Texas Bar No. 15430600
                                          NAMAN HOWELL SMITH & LEE PLLC
                                          400 Austin Ave., Suite 800, P.O. Box 1470
                                          Waco, TX 76703
                                          Telephone: (254) 755-4100
                                          Facsimile: (254) 754-6331
                                          palmer@namanhowell.com

                                          *Attorneys for Plaintiffs,*
                                          FRESHUB, INC. and FRESHUB, LTD.

## CERTIFICATE OF SERVICE

The foregoing document was filed electronically on August 11, 2021, with the Clerk of Court using the Court's CM/ECF system, which will send a Notice of Electronic Filing on counsel of record for all other parties who have appeared in this action on the date of such service.

*/s/ Lisa Kobialka*
Lisa Kobialka
